**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DANIELLE WEBB,

CIVIL ACTION NO. 16-11786

*Plaintiff*,                          DISTRICT JUDGE ROBERT H. CLELAND
*v.*                                       MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

*Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 15, 18)

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Webb is disabled. Accordingly **IT IS RECOMMENDED** that Webb's Motion for Summary Judgment, (Doc. 15), be **GRANTED**, the Commissioner's Motion, (Doc. 18), be **DENIED**, and that this case be **REMANDED**.

### II.   REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Danielle Webb's ("Webb") claim for a period of disability and Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 15, 18).

On March 25, 2013, Webb filed an application for DIB, alleging the disability onset date of April 20, 2012. (Tr. 144-46). The Commissioner denied her DIB claim. (Tr. 72-67). Webb then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on May 6, 2015, before ALJ Jan Leventer. (Tr. 35-71). At the hearing, Webb—represented by her attorney, Michael Corby—testified, alongside Vocational Expert ("VE") Stephanie Lorry. (*Id.*). The ALJ's written decision, issued June 16, 2015, found Webb not disabled. (Tr. 19-31). On March 14, 2016, the Appeals Council denied review, (Tr. 1-6), and Webb filed for judicial review of that final decision on May 19, 2016. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

## C.     Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R.

404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Webb not disabled under the Act. (Tr. 19-31). At Step One, the ALJ found that Webb last met the insured status requirements of the Social Security Act on December 31, 2016, and had not engaged in substantial gainful activity in the interval between her alleged onset date of April 20, 2012 and her date last insured. (Tr. 21). At Step Two, the ALJ concluded that the following impairments qualified as severe: post-traumatic stress disorder ("PTSD"); cephalgia headaches, status post right foot great toe avulsion correction, contusions of bilateral knees, obesity, and left wrist fracture and torn ligaments status post two surgeries. (Tr. 21). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 22). Thereafter, the ALJ found that Webb had the residual functional capacity ("RFC") to perform sedentary work with the following additional limitations:

> [O]ccasional overhead reaching with the left upper extremity; occasional reaching with the left upper extremity in all other directions; occasional handling, fingering, and feeling with the left upper extremity; no climbing of ramps, stairs, ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, and crouching; no crawling; no work at unprotected heights or with moving mechanical parts; occasional operation of a motor vehicle; limited to simple, routine tasks involving only simple, work-related decisions; and can respond to the public and coworkers appropriately on a frequent basis.

(Tr. 24). At Step Four, the ALJ found Webb incapable of performing her past relevant work as a welder or porter through his date last insured. (Tr. 29). But proceeding to Step Five, the ALJ determined that "there are jobs [through her date last insured] that exist in significant numbers in the national economy that the claimant could have performed . . . ." (*Id.*).

### E.     Administrative Record

#### 1.     Medical Evidence

The Court has reviewed Webb's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.     Application Reports and Administrative Hearing

##### i.     Function Report

Webb filled out a Function Report, which appears in the record. (Tr. 179-86). In it, she described how her "left hand/wrist has limited movement" and "I am unable to push/pull anything over 15 lbs. I have horrible anxiety and PTSD from accident. Depression as well from all of the above." (Tr. 179). Each day, she woke up, ate breakfast, took a shower, blow-dried her hair, watched the news, reviewed her calendar, took her medications, and went to appointments. (Tr. 180). Her boyfriend helped her "pick[] up the dog waste and walk[] the dog." (*Id.*). Before the onset of her illnesses, she remained able to work her previous jobs, play guitar, and drive a vehicle regularly. At the time of writing, however, she simply had a "hard time winding down." (*Id.*). Cooking was also difficult

due to her wrist injury. (Tr. 181). Nor did she do laundry, for she could not lift the hamper. (Tr. 182).

With respect to mental impairments, Webb often had anxiety attacks and could not drive on the highway due to PTSD. (*Id.*). She went outside "a couple to few times daily." (*Id.*). She nevertheless remained able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.*). Though her hobbies included reading, making art, movies, working with computers, nature walks, guitar, and skating, she did not do any of these "often at all." (Tr. 183). "Sin[c]e the illness I haven't really made any art. Just been really depressed. Can't play guitar. Can't skateboard." (*Id.*). On occasion, Webb would watch television or movies, or go out to eat, with others, but she did not do these activities often. (*Id.*). "Don't really go out with friends and socialize as much as I used to." (Tr. 184).

Prompted to check boxes beside abilities now difficult for her, Webb marked: lifting, kneeling, memory, completing tasks, concentration, understanding, following instructions, and using her hands. (*Id.*). She could walk three-quarters of a mile before needing five-minutes' rest. (*Id.*). She could follow written instructions "fairly well," but would "get confused" with spoken instructions because "I don't remember things very well." (*Id.*). Stress and changes in routine tended to trigger her anxiety and cause panic attacks. (Tr. 185).

### ii.     Webb's Testimony at the Administrative Hearing

Webb opened her testimony by noting that she had treated with Dr. Neshewat at "Southgate," largely in the form of medication and a referral to a knee specialist. (Tr. 46). She visits the office biweekly for pain management. (Tr. 47). During the visits, she

acquired a two-week supply of methadone to wean her off of opiates. (Tr. 48). Though she had treated regularly at "Apex Behavioral" for mental health, they began refusing her insurance in November 2014. (Tr. 49). As a result, she had not "received mental health treatment for the last six or so months" from that location, and began visiting "Downriver Guidance Center" in February 2015. (*Id.*). She saw her therapist biweekly. (Tr. 51). The help provided took the form of "a sense of calmness" amidst the "roller coaster going on in my life." (*Id.*).

Thereafter, Webb recounted the medications she was taking: Prozac, Lamictal, Xanax, Adderall, Omeprazole, nicotine patches, Naproxen, Flexeril, and Motrin 800, as well as methadone. (Tr. 53). Side effects included sleepiness without the ability to sleep and an inability to concentrate. (Tr. 53-54).

When prompted, Webb indicated that she had been looking for work, but the possibility of requiring a knee surgery put a stop to her search. (Tr. 54-56). The other factor restricting her job search was her inability to lift "over a certain amount of weight" and her "restrictions on lifting, pushing, [and] pulling." (Tr. 57). She a dental office job for a week in 2013, as well as a month-ling home healthcare aide job in November 2014, but neither opportunity worked out because "[i]t got too strenuous on my wrist," and "I couldn't lift the patients." (Tr. 58).

Webb's attorney then lobbed a few questions her way. Webb indicated she could lift up to twenty-five pounds, and could walk "a quarter of a mile" before needing ten-minutes' rest. (Tr. 59). She could stand for "[m]aybe 20-25 minutes." (*Id.*). Each day she napped for "[t]wo to five hours," and she could do laundry so long as she did not have to

"carry it up and down the stairs." (Tr. 60). "I have a hard time vacuuming, mopping. I can't vacuum and mop." (*Id.*).

Webb's mental issues could be triggered by a number of things, including arguing, yelling, aggressive behavior, and accidents. (Tr. 62). "I like to be by myself." (*Id.*). She could focus on television, or other activities, for about five minutes only. (*Id.*). Her migraines could last "all day." (Tr. 65). "I have to be in a really dark space." (*Id.*).

### iii.    The VE's Testimony at the Administrative Hearing

Situating the discussion, the ALJ posited the following hypothetical to the VE: an individual "with past relevant work as a welding machine tender and as porter of used cars, . . . [and] limited to sedentary exertion [with] the following additional limitations: She can reach overhead only occasionally with the left. She can reach in all other directions only occasionally with the left. She can handle, finger, and feel only occasionally with the left. With regard to posture, they can never climb ramps and stairs. She can never climb ladders, ropes, and scaffolds. She can occasionally balance, stoop, kneel, and crouch. She can never crawl. With regard to the environment, she can never work at unprotected heights. She can never work with moving mechanical parts. She can occasionally operate a motor vehicle. With regard to mental limitations, she is limited to simple, routine tasks. She is limited, also, to simple, work-related decisions. She can respond appropriately to coworkers and the public frequently. She is dealing – in terms of dealing with changes in the work setting, she is limited to simple, work-related decisions. Can this hypothetical individual perform the past relevant work?" (Tr. 67-68).

The VE indicated that such an individual could not perform Webb's past work, then asked for clarification as to whether the ALJ's hypothetical included a limitation that "she can only occasionally reach with her left arm and hand for grasping and reaching and handling," which the ALJ affirmed. (Tr. 68). The VE disclosed one available job as a "surveillance-system monitor," which was "non-government work" and thus non-conforming "with the *DOT* in that variable." Further, the VE offered that 17,000 such job availabilities existed in the national economy. (Tr. 68-69).

The ALJ added "one more limitation" in constructing a second hypothetical: "that the individual is off task 20 percent of the work day, over and beyond other work breaks – ordinary work breaks, . . ." (Tr. 69). The VE certified that such an individual could not perform work in the national economy. And on a closing note, the ALJ pressed further on the VE's job suggestion, asking whether—aside from the non-governmental-work-versus-governmental-work distinction between the VE's testimony and the DOT made earlier—the VE's testimony was consistent with the DOT. (*Id.*). The VE indicated that it was, "[o]ther than the overhead reaching" which was "not a variable in the *DOT*." (*Id.*). The VE did not specify what evidence supported this distinction.

Thereafter, Webb's attorney touched on the inconsistency between the surveillance-system monitor position cited by the VE and that within the DOT. (Tr. 70). The VE clarified that the jobs she identified were unskilled. (*Id.*).

## F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various

categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to

"other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is

measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Webb argues that the ALJ erred in finding that the prospect of work as a surveillance-system monitor in one of 17,000 national jobs disqualified her DIB claim. This finding was flawed, she suggests, because: (1) the job surveillance-system monitor does not exist as described in the DOT or conform with the ALJ's hypothetical; (2) the job surveillance-system monitor cannot, on its own, furnish a substantial number of jobs in the national economy; and (3) in any case, the VE's projected figure of 17,000 national job availabilities—without reference to regional job availabilities—could not support the ALJ's conclusion that a substantial number of jobs existed in the national economy. I consider each argument in turn.

### 1.    The VE's Testimony Failed to Establish Compatibility Between Webb's RFC and the Job "Surveillance System Monitor"

Recounting how the VE admitted that the non-governmental surveillance-system monitor job did not conform to the DOT's government-only surveillance-system monitor job, Webb suggests that "there was never an explanation for the inconsistency" in describing 'non-governmental surveillance system monitor' as an unskilled job, and that the ALJ's reliance on VE testimony in this respect constitutes remandable (if not

15

reversible) error. (Doc. 15 at ID 542-43). To this, the Commissioner suggests that Webb waived any such argument when she did not raise it during the hearing. (Doc. 18 at ID 567). Alternatively, the Commissioner posits that no actual inconsistency existed, as "there is no indication that whether the position is government or non-government work made a difference in its job requirements." (Doc. 18 at ID 569). In short, the Commissioner offers that "[i]t is not clear what further explanation was necessary, nor did [Webb's] representative find it warranted to seek further explanation at the hearing." (*Id.*).

"Once a claimant has established that she is unable to return to any of her past relevant work, the burden shifts to the Commissioner to show that there is work in the national economy which she can perform." *Matelski v. Comm'r of Soc. Sec.*, 149 F.3d 1183, at *9 (6th Cir. 1998) (unpublished table decision) (citing *Barney v. Sec'y of Health & Human Servs.*, 743 F.2d 448, 449 (6th Cir. 1984)). Fulfilling this burden requires that—should the ALJ rely on the VE's testimony—she ensure it contains no unresolved conflicts. According to SSR 00-4p, "the adjudicator must elicit a reasonable explanation" for any "apparent unresolved conflict between VE . . . evidence and the DOT . . . before relying on [that] evidence to support a determination or decision about whether the claimant is disabled, and further, "[t]he adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information." 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000).

This ruling emphasizes two particularly relevant details: On the one hand, only the presence of an *apparent* conflict triggers an ALJ's duty to inquire further into the roots of

that conflict. *See, e.g.*, *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009) ("[T]he ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p."); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009) ("There is little doubt that the ALJ satisfied his obligation under S.S.R. 00-4p by asking VE Breslin about any apparent discrepancies between the information provided by the DOT and that which Breslin himself presented."). On the other hand, any explanation solicited for such conflict must prove itself *reasonable* to earn the ALJ's reliance. *Cf. Tommasetti v. Astrue*, 533 F.3d 1035, 1042 (9th Cir. 2008) (finding the ALJ's reasoning erroneous when "[t]he ALJ did not identify what aspect of the VE's experience warranted deviation from the DOT, and did not point to any evidence in the record other than the VE's sparse testimony for the deviation").

The job of surveillance system monitor, in particular, tends to foment confusion on appeal. In *Cunningham v. Astrue*, 360 F. App'x 606, 615 (6th Cir. 2010), the Sixth Circuit found the DOT's description of this job "potentially vulnerable" as "obsolete," and requiring "a more recent source of information [to] be consulted." Indeed, the DOT was "more than a decade old" when the ALJ heard Cunningham's claim, and the Sixth Circuit remanded to determine "whether the DOT listing[]" of surveillance-system monitor was "reliable in light of the economy as it existed at the time of the hearing before the ALJ." *Id.* at 615-16. Although *Cunningham* "did not declare that the job of security monitor was unreliable or obsolete," *Hayes v. Comm'r of Soc. Sec.*, No. 1:09-cv-1107, 2011 WL 2633945, at *12 (W.D. Mich. June 15, 2011), the record nevertheless "must be sufficient to satisfy the Commissioner's step five burden," *Rollston v. Comm'r of Soc. Sec.*, No. 1:16-

CV-168, 2016 WL 6436676, at *4 (W.D. Mich. Nov. 1, 2016) (remanding where "the VE identified only the surveillance system monitor position" and "[t]he VE's testimony that she visited a single facility on an unspecified date," and that this certified the reliability of her testimony, "does not alleviate the concern raised by the *Cunningham* court"). *Cf. Duong v. Comm'r of Soc. Sec.*, No. 1:15-CV-1206, 2016 WL 5423483, at *5 (W.D. Mich. Sept. 29, 2016) (refusing to remand where the VE "resolved the conflict [with the DOT] by noting that the sit/stand option is not included and the DOT, and . . . he based his testimony on knowledge and experience").

The ALJ in this case relied on the VE's testimony, and discussed her reasoning as follows:

> While the DOT does not provide information on overhead reaching, the vocational expert's testimony is based on her knowledge and experience [and] is adopted. Furthermore, the vocational expert testified that, although the DOT refers to surveillance system monitor as a government position, the job numbers cited by the vocational expert referred to those surveillance system monitor positions that were not governmental positions. When the testimony of a vocational expert differs from the DOT, the Administrative Law Judge may rely upon the vocational expert . . . .

(Tr. 30) (citing SSR 00-4p, 2000 WL 1898704 (S.S.A. Dec. 4, 2000)). Webb urges this Court to find that the job surveillance-security monitor requires more than the DOT suggests, making reliance on the DOT error in itself. This I cannot do. Agency policy "permits ALJ's [sic] to rely on the DOT." *Baty v. Comm'r of Soc. Sec.*, No. 1:14-cv-14669, 2016 WL 6246387, at *7 (E.D. Mich. Feb. 9, 2016). "And, in the five years since [*Cunningham*], ALJs and courts have continued to rely on VE testimony grounded in the DOT, and have affirmed findings of non-disability based on VE testimony that a claimant

can perform the job of surveillance system monitor." *Jones v. Comm'r of Soc. Sec.*, No. 14-13709, 2015 WL 12696225, at *7 (E.D. Mich. Sept. 30, 2015), *report and recommendation adopted*, No. 14-13709, 2016 WL 47968 (E.D. Mich. Jan. 5, 2016). Nor can I find that Webb's RFC does not conform to the reasoning levels specified as necessary for the occupation of surveillance-system monitor in the DOT. *Accord Baty*, 2016 WL 6246387, at *7 ("[T]he Sixth Circuit rejected the proposition that '[DOT] jobs requiring reasoning levels two or three are inconsistent as a matter of law with a limitation to simple work.'" (quoting *Monateri v. Comm'r of Soc. Sec.*, 436 F. App'x 434, 446 (6th Cir. 2011))); *Moran v. Comm'r of Soc. Sec.*, 40 F. Supp. 3d 896, 930 (E.D. Mich. Aug. 22, 2014) ("[A]bundant case law supports the ALJ's interpretation of [surveillance-system monitor] as simple and routine.").

On these facts, however, I note that the VE never gave *any* explanation for the apparent, and *admitted*, inconsistencies between her testimony and the DOT. Although the ALJ assumes that her testimony was based on "knowledge and experience," (Tr. 30), Webb correctly notes that the VE never said as much with respect to either the overhead-reaching distinction or the non-governmental-only distinction:

> [VE]: Okay. Your Honor, I have one job title. A surveillance-system monitor. It's as non-government work. So, it does not conform with the *DOT* in that variable. . . .
>
> [ALJ]: And is your testimony, except for the point you made regarding surveillance-system monitor – other than that, is your testimony

19

> consistent with the United States *Dictionary of Occupational Titles* and
>
> also the Selected Characteristics of Occupations, also a U.S. book?
>
> [VE]: Yes. Other than the overhead reaching, Your Honor, this is not
>
> a variable in the *DOT*.

(Tr. 68-69). The Commissioner minimizes the VE's omission, begging the Court to read into the VE's testimony an "implicit[] indicat[ion] that she was relying on her own knowledge and experience in addition to the DOT," (Doc. 18 at ID 575), but the ALJ's duty requires her "to *obtain* a reasonable explanation for [a] discrepancy," not to imply one. *Miracle v. Astrue*, No. 3:06-0918, 2009 WL 5066879, at *22 (M.D. Tenn. Dec. 21, 2009) (emphasis added). Reaffirming or rooting out the existence of a conflict does not qualify as *explaining* it. The ALJ's reliance on the VE's testimony, therefore, was error. And because the ALJ's ultimate conclusion relied exclusively upon such shaky ground, the error was not harmless. Remand is required on this ground.

### 2. The Job "Surveillance System Monitor" Can Theoretically Provide a Substantial Number of Jobs in the National Economy

Webb's second argument posits that "[f]ederal case law confirms that where a VE names only surveillance system monitor, that without more a significant number of jobs does not exist." (Doc. 15 at ID 547). As the Commissioner notes, the issue possesses no answer so certain. *Compare, e.g.*, *Tilley v. Colvin*, No. 1:14-CV-421, 2015 WL 4910485, at *3 (S.D. Ohio July 27, 2015), *report and recommendation adopted sub nom. Tilley v. Comm'r of Soc. Sec.*, No. 1:14CV421, 2015 WL 4885540 (S.D. Ohio Aug. 17, 2015) ("The ultimate issue is whether the ALJ identified a significant number of jobs existing in the

economy that Plaintiff, with her vocational background and RFC, could perform. The VE's testimony that Plaintiff could perform one job, surveillance system monitor, which meant that there were at least 79,000 jobs that she could still perform in the national economy and 3,500 regionally. . . . represents a significant number of jobs." (internal citation omitted)), *with Rollston*, 2016 WL 6436676, at *4 (remanding in part because "the VE identified only the surveillance system monitor position" which *Cunningham* called into question).

Put another way, courts in the Sixth Circuit seem split as to whether the job 'surveillance-system monitor' can furnish, on its own, a significant number of jobs in the national economy. Those reading *Cunningham* in a more circumscribed manner note that it "is an unpublished, 2-1 decision, which has not been cited since by the Sixth Circuit and has been interpreted narrowly by other courts." *Jones*, 2015 WL 1269225, at *7; *accord Morris v. Comm'r of Soc. Sec.*, No. 1:16-CV-433, 2017 WL 1159809, at *11 (W.D. Mich. Mar. 29, 2017) ("No subsequent Sixth Circuit decision has cited the unpublished *Cunningham* decision or questioned the 'reliability' of VE testimony in a similar fashion."). Such circumspection, however, simply ignores the persuasive value of *Cunningham*'s observation that the DOT's job descriptions plainly seem tired at times—a well-reasoned insight given credence by several later courts. *E.g.*, *Rollston*, 2016 WL 6436676, at *4; *Coulter v. Colvin*, No. 1:13-CV-00011-LLK, 2013 WL 3992445, at *2 (W.D. Ky. Aug. 2, 2013) (remanding because the jobs cited, including surveillance-system monitor, were found potentially obsolete by *Cunningham*); *accord Kuleszo v. Barnhart*, 232 F. Supp. 2d 44, 55 (W.D.N.Y. 2002) ("The existence of only one unskilled sedentary job, *i.e.* surveillance system monitor, indicates that the full range of sedentary work is

significantly eroded."); *cf. Williams v. Colvin*, No. 1:14-CV-02183, 2015 WL 5165458, at *7-8 (N.D. Ohio Sept. 2, 2015) (invoking the Sixth Circuit's skepticism of the DOT's obsolescence as a factor in remanding where surveillance-system monitor was the only position a claimant could perform). Nevertheless, the weight of authority tends to advise against remand grounded *solely* upon speculation as to the DOT's accuracy with respect to the description of 'surveillance-system monitor.' *See Smathers v. Comm'r of Soc. Sec.*, No. 2:14-CV-500, 2015 WL 401017, at *5 (S.D. Ohio Jan. 28, 2015), *report and recommendation adopted*, No. 2:14-CV-500, 2015 WL 5568324 (S.D. Ohio Sept. 22, 2015) (remanding because the VE's surveillance-system monitor job figure—upon which the ALJ relied—remained susceptible to multiple interpretations and "the difference" between them "may very well be significant.") ; *Belew v. Astrue*, No. CIV.A. 2:11-107-DCR, 2012 WL 3027114, at *10 (E.D. Ky. July 24, 2012) ("The VE testified that the hypothetical RFC and limitations were 'consistent with nearly the full range of sedentary and unskilled work.' . . . The fact that one or even two of the listed examples of sedentary unskilled work may be outdated does not make it unreasonable for the ALJ to rely on the VE's conclusion that Belew is capable of performing 'pretty much a full range of sedentary unskilled work.'").

Though remand remains appropriate in this case, the reason therefor derives from the ALJ's reliance on VE testimony that failed to rectify its inconsistency with the DOT. That 'surveillance-system monitor' was the only job identified did not, by itself, disqualify the ALJ's conclusions.

### 3. The ALJ Lacked the Evidence to Conclude that Enough "Surveillance System Monitor" Jobs Existed Such that There Were a Substantial Number of Jobs Webb Could Perform

As a last point, Webb suggests that the VE's failure to specify regional or local numbers "as required by case law and Social Security regulations" tainted her testimony, such that the ALJ should not have relied upon it to find that a substantial number of jobs existed in the national economy which Webb could perform. (Doc. 15 at ID 551). But, contrary to Webb's assertion, case law and regulations do not exactly require a specification of regional numbers, *per se*. *E.g.*, *Gibbens v. Comm'r of Soc. Sec.*, No. 2:14-CV-185, 2015 WL 5682865, at *7 (W.D. Mich. Sept. 25, 2015), *aff'd*, 659 F. App'x 238 (6th Cir. 2016) ("[T]he Commissioner is not required to show that job opportunities exist within the local area." (quoting *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999)) (internal quotation marks omitted)). The relevant regulations note that "it does not matter whether . . . [w]ork exists in the immediate area in which you live," 20 C.F.R. § 416.966(a)(1) (1997), though they exclude "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [plaintiff] live[s]," *id.* § 404.1566(b). Construed another way, Webb's complaint prods the logic behind the ALJ's Step Five determination as a whole, and in particular the substantial-number-of-jobs inquiry.

In *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988), the Sixth Circuit laid out several factors for courts to consider in determining whether claimants can perform a substantial number of jobs in the national economy:

A judge should consider many criteria in determining whether work exists in significant numbers, some of which might include: the level of claimant's disability, the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on. The decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation.

*Id.* The ALJ's failure to solicit regional numbers or discuss any of these factors at Step Five illustrates, in turn, her failure to even consider numerous factors critical to the substantial-number-of-jobs inquiry.[1] That the VE identified only one (suspect) category of jobs Webb could perform strengthens this conclusion. Coupled with the ALJ's reliance on inchoate VE testimony in her Step Five determination, this error also requires remand.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Webb's Motion for Summary Judgment, (Doc. 15), be **GRANTED**, the Commissioner's Motion, (Doc. 18), be **DENIED**, and that this case be **REMANDED**.

## III.    REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may

---

[1] This is not to say that the ALJ did not consider *any* of these factors. Indeed, Webb could not make such an argument without also imputing error to the ALJ's RFC analysis and credibility determination—arguments she does not make. Nevertheless, *Hall* commands the consideration of "many criteria," and the ALJ here plainly did not adequately consider "the reliability of the vocational expert's testimony," "the distance claimant is capable of traveling to engage in the assigned work," "the isolated nature of the jobs," or "the types and availability of such work," among other things. Such an error is not harmless because it imperils the foundational rationale of the ALJ's Step Five determination. On remand, the ALJ should clarify her position on these issues and ensure the Court (and claimant) can track her reasoning.

respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: April 25, 2017                                   S/ PATRICIA T. MORRIS
                                                       Patricia T. Morris
                                                       United States Magistrate Judge

## <u>**CERTIFICATION**</u>

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: April 25, 2017                           By <u>s/Kristen Castaneda</u>
                                               Case Manager